1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Action No. 12-CR-00010-MSK

UNITED STATES OF AMERICA,

    Plaintiff,

vs.

RICHARD W. JOHNSON,

    Defendant.

_____

**REPORTER'S TRANSCRIPT**
(Detention Hearing)

_____

     Proceedings before the HONORABLE MARCIA S. KRIEGER, Judge, United States District Court for the District of Colorado, commencing at 9:07 a.m., on the 10th day of February, 2012, in Courtroom A901, United States Courthouse, Denver, Colorado.

**APPEARANCES**

     GUY TILL, Assistant U.S. Attorney, 1225 17th Street, Suite 700, Denver, Colorado, 80202, appearing for the plaintiff.

     MILLER LEONARD, Attorney at Law, 14143 Denver West Parkway, Suite 100, Golden, Colorado, 80401, appearing for the defendant.

Proceeding Recorded by Mechanical Stenography, Transcription Produced via Computer by Paul Zuckerman, 901 19th Street, Room A259, Denver, Colorado, 80294, (303) 629-9285

**PROCEEDINGS**

1

2        (In open court at 9:07 a.m.)

3            *THE COURT:*  Please be seated.

4            We're convened today in Case No. 12-cr-10, which is

5    encaptioned for purposes of today's hearing as the United

6    States of America vs. Richard W. Johnson.  The matter is before

7    the Court with regard to issues of detention.

8            Could I have entries of appearance, please.

9            *MR. TILL:*  Good morning, your Honor.  Your Honor, I'm

10   Guy Till.  I'm an Assistant United States Attorney,

11   representing the Government.  Also present at counsel table to

12   assist me today is ATF Special Agent Leviticus Desrosier.

13           *THE COURT:*  Good morning and welcome.

14           *MR. TILL:*  Thank you, your Honor.

15           *MR. LEONARD:*  Good morning, your Honor.  My name is

16   Miller Leonard.  I represent the defendant, Richard Johnson.

17           *THE COURT:*  I'm sorry.  I can't hear you sir.  You

18   need to speak into the microphone or up a little bit.

19           *MR. LEONARD:*  My name is Miller Leonard, your Honor.

20   I represent Mr. Johnson.  He appears in person and in custody.

21   I'm appointed CJA counsel on this case.

22           *THE COURT:*  Good morning and welcome.

23           Are you all ready to proceed?

24           *MR. TILL:*  Yes, your Honor we are.

25           *THE COURT:*  All right.  Please do so.

1            MR. TILL:  If it please the Court, Counsel, your

2    Honor, procedurally, one thing is different today than when we

3    appeared before the United States magistrate judge, is that

4    since that time when we appeared before the magistrate judge,

5    your Honor, we did receive a superseding indictment in this

6    case and there are some additional charges involving

7    Mr. Johnson at this time.

8            In the first superseding indictment, Mr. Johnson has

9    been charged in Count 34 with prohibited person in possession

10   of a firearm.  In Count 35, Mr. Johnson has been charged with

11   possession of a firearm in furtherance of a drug-trafficking

12   felony.  And in Count 36, he's been charged as a person --

13   prohibited person in possession of ammunition.  And in Count 37

14   Mr. Johnson, has been charged as a prohibited person

15   in -- excuse me -- a person in possession of an illegal weapon

16   actually, your Honor.  It was a short-barreled shotgun is the

17   allegation, anyway.

18           So, your Honor, there are some additional charges

19   pending against Mr. Johnson at this time.  We mentioned the

20   predicate facts for some of those charges or perhaps all those

21   charges when we were before the magistrate judge, but we did

22   not actually present him with evidence to back it up.  We have,

23   I think, today done a better job.

24           And I apologize to the Court for the manner in which I

25   raised this.  And I have learned.  I believe I will do better

1    in the future, but it's the kind of thing that hasn't come up

2    for me very often.  And I think I was trying to invent it, and

3    I don't think I did a very good job of getting it out there.

4            But anyway, your Honor, today we did get some exhibits

5    together to show the Court and Counsel some of the evidence in

6    this case as to Mr. Johnson.  And I believe that we have a

7    stipulation to admissibility of these exhibits for the purposes

8    of this hearing and the Court's determination of the question

9    before the Court.

10           And if I could, I don't know if the -- a copy of the

11   exhibits has made its way up to the bench.

12           THE COURT:  It has.

13           MR. TILL:  Okay.  Your Honor, if I could just mention

14   a few of them to the Court.

15           THE COURT:  Well, let's first of all see if there is

16   an agreement about consideration of these exhibits.

17           MR. TILL:  Your Honor.  At this time then I would like

18   to offer for the purposes of this hearing Exhibits 1 through

19   18, your Honor.

20           THE COURT:  Any objection?

21           MR. LEONARD:  Thank you, your Honor.

22           No, for purposes of this hearing, there is no

23   objection to the admission.

24           THE COURT:  All right.  Thank you.  Then the Court

25   will consider Exhibits 1 through 18.

1          MR. TILL:  Your Honor, Exhibit 1 is the exterior of

2     the clubhouse of the Hell's Lovers Motorcycle Club.  And

3     basically for purposes of orientation, this was -- this is the

4     location that was searched on January 20, 2012.

5          Exhibit 2 is a photograph of the colors or a club vest

6     that was being worn by Mr. Johnson.  And each of these patches

7     basically represents something about his involvement with the

8     club.  And in a sense, it's almost like a soldier or marine in

9     terms of wearing their uniform and showing where they have

10    served and what they have done, and so forth.  So he's quite a

11    veteran of this organization, your Honor.  He is a full

12    christened member.  And that is not an easy thing to

13    accomplish.  It takes years to go through their process, and it

14    is very challenging physically and mentally in my opinion.

15         I would indicate to the Court and to Counsel and

16    Mr. Johnson that I do not approve of the culture of this

17    organization; however, in a certain way, I do take them very

18    seriously.  And so I believe I would say I do respect this

19    motorcycle club or motorcycle gang, this organization, and so

20    forth.  And I respect and take seriously Mr. Johnson's roll in

21    it.  Don't approve of it, but I think I understand it.

22         Exhibit 3 is a weapon that was found on the floor,

23    your Honor, of the club on January 20.

24         And further down in the list of exhibits is a report

25    interview that Mr. Johnson gave to one of the ATF agents that

```
 1   evening about this weapon and what it means.  And basically,
 2   your Honor, this weapon is a clubhouse weapon, meaning it is
 3   the property of the club.  It was found on the floor.
 4   Mr. Johnson had ammunition on his person that was consistent
 5   with this weapon, your Honor.  And his explanation basically --
 6   and of course the report gives a more full explanation of all
 7   this -- but basically his explanation of why he had the
 8   ammunition is because he is a quote, "enforcer," unquote, for
 9   this club.
10          This is a club of people, your Honor, who are --
11   Individually, I would describe them as tough individuals.  They
12   are -- they are not easily intimidated.  They are, some of
13   them -- Whether they have felony convictions, whether they've
14   been to prison or not, they are tough individuals who can
15   survive in the gang culture, your Honor.
16          THE COURT:  Well, let me interrupt for just a minute.
17   Today's hearing is not about who the defendant is.  It's not
18   about the club.  It's about what this defendant has done or
19   might be likely to do.
20          MR. TILL:  I understand.
21          THE COURT:  And so I think we need to put aside any
22   personal opinions about this.  I'm concerned about whether or
23   not Mr. Johnson should be released, whether there are
24   conditions that will ensure that he both appears for the
25   hearings that are required in this case, and that the safety of
```

1   the public is maintained.

2           MR. TILL:  I understand.

3           THE COURT:  So much of what you're talking about, the

4   motorcycle club and views as to how it operates, may not be

5   pertinent here.

6           MR. TILL:  I understand.  But I believe I can connect

7   it up, your Honor, if you'll indulge me a little bit.

8           THE COURT:  All right.

9           MR. TILL:  Thank you.

10          So basically, your Honor, within the context of this

11  group, Mr. Johnson is, quote, an enforcer.  He's self-

12  describing himself as an enforcer.  He is one of the toughest

13  people in that club, your Honor.  He is ready to use force,

14  he's ready to use violence to protect the club and the club's

15  interest.  He's a volunteer in that regard.  He is a volunteer

16  in order to be a member of the club, but he's a super volunteer

17  in order to step forward and be an enforcer, your Honor; so he

18  place a critical role.  He's a very intimidating person within

19  the context of the club.  Other club members regard him as

20  intimidating, your Honor.

21          And he -- one of the concerns here -- there is a

22  concern under the Bail Reform Act for the safety of the

23  community and also for the safety of another person.  And in

24  this particular case, I'd advise the Court that the way the ATF

25  conducted this investigation, they did penetrate this

1    organization with confidential and human source information.

2    Some of these confidential source of human information people

3    are christened members of Hell's Lovers Motorcycle Gang.  The

4    other members of the club will be very upset with them for

5    being a, quote, "rat," being a, quote, "snitch," if and when

6    they figure out who these people are, which I believe they will

7    understand once they look at the discovery in this case.

8         So we are concerned for the physical safety and

9    intimidation of the witnesses, your Honor, especially the

10   confidential human source type people.  There is a very intense

11   personal relationship and commitment between and among the

12   people.  They regard each other as, quote, "brothers," unquote.

13   There will be a sense of betrayal and anger once they

14   understand how the ATF did this investigation.

15        Okay.  Exhibit 4 is more ammunition recovered from the

16   Hell's Lovers Motorcycle Club, your Honor.

17        Exhibit 5 is -- is the interview with Mr. Johnson.

18   His nickname from his peers, your Honor, is Supa, S-U-P-A.  We

19   understand that to be a cognate for "Super," and it's basically

20   a term of respect from his peers.

21        Exhibit 6 has to do with the execution of a search

22   warrant on his home the next day on January 21.  During the

23   course of the conversation with Mr. Johnson, ATF Special Agent

24   Cole learned that Mr. Johnson has apparently a pistol which

25   they were led to believe would be at his home.  They wanted to

 1    secure the pistol.

 2            Mr. Johnson has a couple of grounds arguably from

 3    being barred from having a weapon.  He has prior felony

 4    convictions.  He also has what we understand to be a domestic

 5    violence conviction.  So he would be barred on those two

 6    grounds.  And the ATF wanted to secure the weapon that they

 7    thought was at his house based on his interview.

 8            When they went to the house, they did not find the

 9    pistol that Mr. Johnson had mentioned as being his weapon of

10    preference, but they did find a short-barreled 12-gauge

11    shotgun.  So this is the report about that.

12            Exhibit 7, your Honor, shows the short-barreled

13    shotgun, where it was found in the home.  Basically it's got a

14    sawed-off stock.  The stock's been wrapped in tape.  It also

15    apparently has a shortened barrel.  So it is a prohibited

16    weapon based on the overall length of the weapon and is also by

17    the shortened barrel -- and I guess I'm being probably somewhat

18    incorrect by indicating it's a prohibited weapon.  Basically a

19    person could have this weapon if it was registered to them in

20    the National Firearms Registration and Transfer Record, which

21    it is not.  So I suppose like law enforcement or someone who

22    had it registered to them could have it, so it's not *per se* an

23    illegal weapon; but it must be registered, and it is not

24    registered.  It was loaded when they found it.

25            Exhibit 9 is more ammunition for that weapon, your

1    Honor.

2            Exhibit 10 is a picture of the closet where it was

3    found.

4            Exhibit 11 has a holster and additional ammunition

5    that was found at the home.  The holster and some of the

6    ammunition would be consistent with the kind of pistol that is

7    still missing.

8            Exhibit 12, your Honor, is more ammunition.

9            Exhibit 13 has to do with the interstate nexus which

10   sort of goes to the strength of the case.

11           There is an identifying photo of Mr. Johnson from DMV,

12   Exhibit 14.

13           Exhibit 15 is his -- some information about his

14   criminal record, your Honor.

15           Exhibit 16 more information about his record.

16           Exhibit 17 has to do with the domestic violence issue.

17   There was a little bit of confusion at the initial bond release

18   hearing.  It wasn't completely clear whether that was in fact a

19   domestic violence matter or some other kind of matter.  We,

20   looking at Exhibit 17 and 18, your Honor -- we think it is

21   actually a domestic violence matter.

22           So basically, your Honor, our position is that this is

23   a person who is very, very committed to the Hell's Lovers

24   Motorcycle Club.  The prosecution in this case goes against the

25   Hell's Lovers Motorcycle Club.  He's somebody who is a

1    volunteer to defend it.  We are concerned that he could be

2    involved in taking any kind of action against confidential

3    human informants in this case, and we are asking the Court to

4    detain him without bond.

5         The pretrial services report in this case, I believe,

6    recommended detention without bond.  And they made that

7    recommendation, your Honor, without knowledge of the details

8    and circumstances of the case, the strength of the case, that

9    kind of thing.  And they made that recommendation before the

10   additional charges were returned in the first superseding

11   indictment.

12        So I would ask the Court respectfully to please give

13   serious consideration to the pretrial services recommendation,

14   and I would ask the Court to give effect to the presumption

15   favoring detention.  There is just, I would submit -- there

16   are -- there are -- As far as I can tell, there is really

17   nothing to rebut the -- effectively the presumption of

18   dangerousness on this individual.  He -- he is committed, he

19   has the tools of the trade.  He has been an enforcer for years.

20   And probably this is one of the largest challenges to the

21   existence of the Hell's Lovers Motorcycle Club that has ever

22   taken place in the State of Colorado.

23        Therefore, we respectfully ask the Court to detain him

24   without bond, your Honor.

25             THE COURT:  Mr. Till, do I correctly assume that all

1    of the weapons that are pictured in the exhibits are in FBI or

2    other government custody?

3           MR. TILL:  They are.  But there is the Glock that he

4    says he owns that we did not recover from his house, your

5    Honor.  And he did have ammunition for it.

6           So we believe he is telling the truth about that, but

7    apparently some friend, somebody removed the Glock but didn't

8    remove the shotgun before we got there.

9           THE COURT:  What's the status on the operation of the

10   club?

11          MR. TILL:  The club is still operating, but

12   approximately 16 people who are members or associates, probably

13   almost all of the officers of the club but not every single

14   officer of the club, has been indicted.  Some of them are

15   detained without bond.  Some are -- have been released.  And

16   their records -- some members of the club, your Honor, even an

17   officer such as Sheps Khamsahu has been released.  He's been

18   released.  He's on home detention.  But he has no prior felony

19   convictions of any kind.  And other people, such as Corey

20   Riley, who was a former officer of the club, and Calvin Riley,

21   a former officer of the club -- They are detained without bond.

22   But there are a number of officers who are officers such as,

23   say, a treasurer or secretary to the club who have been

24   released; but I would submit that a secretary or treasurer

25   plays a different role from a self-described enforcer, your

1    Honor.  Those individuals also do not have firearms charges.

2              THE COURT:  All right.  Thank you.

3         MR. TILL:  Thank you, your Honor.

4         MR. LEONARD:  May it please the Court, Counsel, your

5    Honor, as is a matter of housekeeping, I would ask that the

6    Court would take judicial notice of Document 64, which was the

7    defendant's objection to pretrial detention and his request for

8    pretrial release.

9              THE COURT:  I'm happy to take judicial notice that it

10   was filed, but that's all I can take judicial notice of.

11        MR. LEONARD:  Thank you, your Honor.

12             I would like to address some of the points made by the

13   Assistant United States Attorney.

14             First I would proffer to the Court that electronic

15   monitoring is in place in the defendant's residence; that when

16   the magistrate judge ordered my client released with

17   conditions, one of the conditions was that he establish

18   electronic monitoring in his home and that he work or his wife

19   work with pretrial services to make that happen.  And that in

20   fact did occur, your Honor; and it is -- my understanding that

21   that still exists and it is in place.

22             Turning to some of the allegations of dangerousness of

23   my client, the priors that are noted as the felony priors out

24   of Illinois are extremely old.  They are from the 70's.  I

25   believe the last one was in 1976.

1           THE COURT:  Perhaps it would be helpful if you tied

2   your comments to the actual exhibit that has been the criminal

3   history.

4           MR. LEONARD:  Sure.  Thank you, your Honor.

5           I'm speaking, your Honor, about Exhibit 16, which was

6   the criminal history query results by Agent Cole and responses

7   dealing his criminal activity in the State of Illinois.

8           Next, your Honor, there has been allegations by the

9   Government -- and it's included in one of the counts of the

10  indictment -- that there was drug involvement at the Hell's

11  Lovers Motorcycle Club clubhouse.  The Government has offered

12  no evidence either by way of exhibit or proffer that my client

13  was engaged in drug-dealing, be it hand-to-hand deals or

14  facilitating drug deals.

15          The evidence, I believe, that the Government has

16  offered is that my client would have been present when drugs

17  were either used or consumed at the Hell's Lovers Motor Cycle

18  Club.

19          Next, your Honor, as the Government mentioned, my

20  client was arrested.  And when he was arrested, he cooperated

21  with agents and did not flee.

22          Next, your Honor, I would proffer that my client has

23  strong ties to the community, in that he has lived in this

24  community since at least 1991.  His -- he is married.  His wife

25  resides in the Denver metropolitan area.

1          *THE COURT:*  Is his wife the same person who was the

2     complainant on the assault charge?

3          *MR. LEONARD:*  Trinnette Johnson.  It appears the name

4     is the same, your Honor.

5          *THE COURT:*  So you think it's the same person?

6          *MR. LEONARD:*  I believe it is the same person, yes.

7          *THE COURT:*  Okay.

8          *MR. LEONARD:*  He also has a son who lives in the

9     Denver metropolitan area.

10         Your Honor, his wife is not present at this hearing.

11    She has been present at every other hearing, including the

12    release hearing that was scheduled and then was stayed.

13         I would proffer to the Court that she is in school,

14    and her school schedule is fairly arduous.  And so she's had to

15    juggle trying to be in school and also attend hearings.  I have

16    had -- report to the Court I've had good telephone

17    communication with her and been able to keep her aware of what

18    is going on in this case.

19         Your Honor, the domestic violence charge which appears

20    as Exhibit 17 in the Government's list -- I would note that my

21    client was discharged early from probation.  And at least it

22    would appear that he was discharged early because he had

23    satisfied the terms and conditions of probation; that he had

24    not been a problem on probation, and that the -- I think it was

25    a magistrate judge in Adams County was satisfied that he no

1    longer was necessary to be supervised by probation for that

2    charge.

3            Next, your Honor, I've turned to the term "enforcer"

4    which the Government has used and offered a definition to the

5    Court as to what that term means.  And we would reject the

6    Government's contention that the word "enforcer" is somebody

7    who goes out and wreaks havoc or violence upon the community

8    and rather that the term "enforcer" as used by the Hell's

9    Lovers Motor Cycle Club is somebody who maintains peace within

10   the club and maintains -- makes sure that there is no violence

11   or activity that's going to cause danger to the members of the

12   club.

13           Your Honor, the Government has made reference to the

14   shotgun, which I believe is Exhibit 8 in the Government's

15   witness or exhibit list.  They've noted that it is a 14 1/2

16   barrel length.  The measurement had to be done by either a tape

17   measure device or some sort of measurement device, so it didn't

18   seem readily apparent by looking at the weapon that it in fact

19   was below the 18-inch currently legal standard for a shotgun to

20   be classified as short-barreled.

21           And the fact that the weapon doesn't have a stock in

22   and of itself doesn't make it illegal.

23           Your Honor, the Government has gone to lengths to show

24   that my client is a threat to the community.  One thing that I

25   would note that the Government hasn't shown is that he has made

1    any threats to any individual during this six-year

2    investigation; that he has been surveilled for any sort of

3    violent activity.  In fact, I think the evidence is to the

4    contrary: that he was cooperative.

5          The guns have been removed from the home.  They don't

6    exist.  Therefore, if my client was returned to the home, he

7    doesn't have access to any firearms.

8          THE COURT:  Do you know where the Glock is?

9          MR. LEONARD:  Your Honor, I don't even know if the

10   Glock ever existed.  So, no, I don't.  I have no information.

11         THE COURT:  Is your client willing to find out where

12   the Glock is and turn it over to the Government?

13         MR. LEONARD:  I have not discussed that with him, your

14   Honor.

15         The -- concerning the Glock, a Glock is a fairly

16   specific weapon, your Honor.

17         THE COURT:  I know.  I fire one routinely.

18         MR. LEONARD:  I own one, too.  And one of the things

19   they didn't do -- and I noticed this when they mentioned the

20   holster.  They didn't note that the holster had a specific

21   characteristic for a Glock to fit into it.

22         As you know, your Honor, then, since you own a Glock,

23   Glocks don't fit in every holster.  And with their safe action

24   trigger, oftentimes holsters are specifically designed to

25   accommodate that safe action trigger to make sure it doesn't

1    discharge.  I've seen no evidence that that holster does fit a

2    Glock.  I don't know if it exists.  I will tell the Court

3    though that I've not discussed that with my client at all.  I

4    can I suppose --

5              THE COURT:  Well, I'll be quite candid --

6              MR. LEONARD:  Sure.

7              THE COURT:  -- that weapons, whether it's a Glock or

8    it's some other kind of pistol, if there was a weapon that your

9    client had that is not accounted for, that is of concern to me.

10             MR. LEONARD:  Understandable.

11        The Government has to a large extent, I believe,

12   rested its detention request on first the presumption.  And we

13   certainly agree that there are charges that raise the level of

14   presumption.

15        And next it turns to whether or not we can rebut that

16   presumption under 3142 and whether or not there is any

17   reasonable series of -- or combinations that you can put on my

18   client that would assure his appearance and that he wouldn't be

19   a threat to the community.  We certainly think that the

20   evidence offered by the Government is that my client is going

21   to show up in court and that the electronic monitoring would

22   assure that he would show up in court.  And it would also show

23   where he is located, what he is doing, and it constrains him to

24   a certain location.

25        The other argument -- and I made this argument in

1    front of the magistrate judge, and he cited that it wasn't a

2    condition he wanted.  I believe the Court has the option and

3    ability to put GPS monitoring on my client, which is another

4    means and mechanism by which the Government would know where my

5    client is, what is he doing, is he returning to any location

6    that they don't want -- In fact, with the GPS, you can even go

7    so far as to indicate locations where he can't even get around

8    into a certain amount of meters or feet.

9          THE COURT:  Well, it looks like, sir, that his working

10   history in 2011 was for seasonal work.  And I'm guessing that

11   at the time of the arrest he was not working; correct.

12         MR. LEONARD:  I believe that's true, but I'm not

13   positive.

14         THE COURT:  All right.  So he doesn't have anyplace to

15   go; right?

16         MR. LEONARD:  Does not, no.  And with his wife's

17   school schedule, he needs to be present to help her study.

18         THE COURT:  Why?  Why is it he needs to be present to

19   help her study?

20         MR. LEONARD:  That's just what his wife has told me,

21   your Honor.

22         THE COURT:  What does he do to help her study?

23         MR. LEONARD:  He helps her with the terms of her

24   program.  It's a medical program, so she needs to relearn some

25   of the words.  And he helps her go back and forth with the

1    definitions involved in her program.

2         *THE COURT:*  Okay.

3         *MR. LEONARD:*  I helped my wife study when she was in

4    school.  She helped me.  It seems absolutely legitimate and

5    reasonable.

6         The other issue with my client is he is 57 years old.

7    He has gout.  He has rheumatoid arthritis.  He has high blood

8    pressure.  There are some health conditions.  He's not somebody

9    who at his age is out when he's not supposed to be.

10        Your Honor, I think we've successfully rebutted the

11   conditions of detention.  I think that that's what the

12   magistrate judge found and why the magistrate judge, after

13   being offered a good deal of this evidence -- In fact, I'm not

14   really sure what's different in the evidence that's been

15   offered today other than the fact that the Government has come

16   in today with actual exhibits rather than offer it by proffer

17   to the magistrate judge.

18        But at the hearing in front of the magistrate judge,

19   the issue of the short-barreled shotgun was brought up, the

20   issue of the ammunition was brought up, the issue of my

21   client's status within the club was brought up, the issue of

22   him being an "enforcer", quote/unquote, was brought up.  Most

23   of that evidence was done by proffer, and we didn't object to

24   it.

25        Prior to my client's detention hearing, the magistrate

1    judge had gone through a number of the codefendants and heard

2    from the case agent, Agent Cole; so the magistrate judge had at

3    least what appeared to me a well [*sic*] understanding of the

4    case and the alleged threats and safety concerns to the

5    community.  And he found that there were conditions and

6    combinations that he could impose upon the client -- on my

7    client that would assure his appearance and safety of the

8    community.

9           We don't think anything has changed.  We certainly

10   realize this is a *de novo* hearing and that you have absolute

11   authority to decide otherwise; but we would ask you to at least

12   consider the magistrate's former ruling as persuasive to the

13   fact that my client is not a threat and he will show up.  And

14   there are conditions you can impose that will assure both of

15   those factors.

16          *THE COURT:*  What are the conditions you think would

17   address the concerns of safety of others and the community?

18   Here's a gentleman that has had a number of guns in his

19   possession, has had a variety of different weapons in his

20   possession, and ammunition to go with each.  There is no

21   evidence before me as to where these were acquired, how they

22   were acquired, whether he can use them, not use them.  How do I

23   address the concern that Mr. Johnson will get his hands on

24   another weapon?

25          *MR. LEONARD:*  Certainly, your Honor.

1          I think the first way you assure the safety of the

2     community is electronic monitoring.

3          THE COURT:  Well, electronic monitoring doesn't

4     prevent him from getting a weapon.

5          MR. LEONARD:  True.

6          THE COURT:  So how do I assure that he doesn't come

7     into possession of a weapon?

8          MR. LEONARD:  I would suggest that the Court could

9     order random monitoring of my client's home; that he has to

10    submit obviously -- he would be on a pretrial detention -- to

11    agents entering his home and making checks of his home to see

12    whether or not he has complied with the terms and conditions of

13    the Court.

14          The weapons don't exist.  The members of the Hell's

15    Lovers Motor Cycle Club are mostly in custody.  So any of the

16    associates that the Government alleges my client has, I don't

17    think he has access to.  And those that are on bond have been

18    granted pretrial release.  There is a condition that they can't

19    associate with one another.  And certainly my client would

20    abide by those conditions.  Those are the means and mechanisms

21    that I can think of that the Court can assure the safety of the

22    community.

23          And I would note that there has been no allegation by

24    the Government that my client has threatened anybody at all.

25          THE COURT:  I understand that, and I understand that

```
 1    your contention is they haven't shown that there is risk; but
 2    I'm assuming for the purposes of our colloquy here that there
 3    is risk.  How do I address it?
 4            MR. LEONARD:  Those are the means I can think of, your
 5    Honor.
 6            THE COURT:  Okay.
 7            Anything else you want me to know?
 8            MR. LEONARD:  No, thank you.
 9            THE COURT:  Thank you.
10            For the Government?
11            MR. TILL:  Your Honor, in terms of how the Hell's
12    Lovers Motor Cycle Club operates, they routinely enforce
13    discipline on their members by beatings, by beat-downs; so in
14    that sense, while an enforcer might be there to protect the
15    club officers from club members who don't want to subject
16    themselves to a beat-down or for members of a rival
17    organization who might come by to do damage or hurt people, his
18    role as an enforcer is not entirely benign at all.  It's not
19    like he is a constable in some village somewhere, your Honor.
20    He has -- there is a clubhouse weapon with ammunition so they
21    can use lethal force, if they need to.  And this individual is
22    prepared to do that.
23            THE COURT:  Well, again, you're focusing on his
24    intent, what he wants to do according to your perspective.
25            MR. TILL:  Yes.
```

1          THE COURT:  What is it your concern that he will do?

2          MR. TILL:  I'm concerned that he will do something to

3    harm or intimidate a witness when they find out exactly which

4    christened members have become cooperators with the Government,

5    your Honor.

6          THE COURT:  And are you concerned that he personally

7    will do this or will direct that this be done?

8          MR. TILL:  Both, your Honor.

9          THE COURT:  Okay.  When we're talking about him

10   personally doing this, would home detention prevent that?

11         MR. TILL:  No, your Honor.

12         THE COURT:  Why not?

13         MR. TILL:  Because he can leave when he desires to do

14   so.  He is an individual who merely by having the weapons that

15   he has, he's violating the laws of the United States.

16         THE COURT:  I understand that.  But again you're going

17   back to exactly what I'm trying to avoid.  I'm assuming there

18   is a risk, and that's all having weapons of -- in violation of

19   the laws of the United States indicates is a risk.  So let's

20   assume there is a risk.  What prevents the risk from being

21   reality?

22         MR. TILL:  Nothing, your Honor.

23         THE COURT:  Nothing does.

24         MR. TILL:  The only thing that will prevent it in the

25   Government's opinion is detention without bond.  This

1    individual needs to be in custody, your Honor.

2         THE COURT:  What prevents him from talking to people

3    and ordering a beat-down or some other kind of punishment or

4    retaliation if he's in custody?

5         MR. TILL:  Well, for one thing, his cell phone calls

6    are being taped, so he could have a face-to-face conversation

7    with someone in detention facility and discuss that.  That

8    could happen.  But his ability to orchestrate something like

9    that and his ability to leave and accomplish it himself is like

10   far, far, far greater if he's outside of detention.

11        THE COURT:  Why is it far, far, far greater?  I

12   understand your contention that he could leave his house and

13   all that would -- what would happen is someone would know that

14   he left his house.

15        MR. TILL:  Right.  Also with regard to access to

16   weapons, your Honor, the Hell's Lovers Motor Cycle Club

17   actually has hundreds of members around the country.  There are

18   many -- there are members, even christened members, in Colorado

19   who are not in custody and are not indicted and not under

20   arrest or any kind of restraint.  But there are also hundreds

21   of members around the country.  So.

22        In terms of can he -- can someone help him, can

23   someone get him a weapon, I'd submit it's -- it's very easy for

24   someone outside -- if he's outside of the detention center, he

25   can acquire a weapon, your Honor.  He could leave and go get

1    the weapon.  Someone could bring a weapon to him.  He can

2    acquire a weapon.

3         THE COURT:  Well, let's assume that he's on home

4    detention and he is prohibited from having contact with anybody

5    but his wife.

6         MR. TILL:  All right.

7         THE COURT:  All right.  How is he going to get a

8    weapon?

9         MR. TILL:  Your Honor, all he has to do to -- He

10   perhaps could even communicate through his wife.  But all he

11   has to do is breach the Court's order or Probation's order in

12   terms of who he speaks to in order to set a situation up where

13   he can acquire a weapon.

14        Your Honor, the culture of this club is that such that

15   the laws of the United States and the orders of court are not

16   things that actually constrain them.

17        THE COURT:  Well, I can't make a determination based

18   on the culture of the club.  I can make a determination based

19   upon this person's characteristics and history but not the

20   club's.

21        MR. TILL:  But, your Honor, he's a volunteer member of

22   the club.

23        THE COURT:  I understand that.

24        MR. TILL:  He's actually an exemplary, paradigmatic

25   member of the club.  He is Supa.  He is a model club member,

1    your Honor.  He submits to the discipline of the club.  He

2    enforces the discipline of the club.  He protects the club in

3    every way.

4         And as I've indicated in terms of breaches of duty and

5    rules of the club, if people became informants for the

6    Government -- have breached their duties to the club.  And they

7    will -- people will want to, quote, "discipline them severely,"

8    your Honor.

9         THE COURT:  All right.  Is there anything else you

10   want to present?

11        MR. TILL:  No, your Honor.  Thank you.

12        THE COURT:  Okay.

13        Any further argument by anyone?

14        MR. TILL:  No, your Honor.

15        MR. LEONARD:  I have no argument, your Honor.

16        I would note that Mrs. Johnson has arrived in the

17   courtroom.

18        THE COURT:  Thank you.

19        We're going to take a brief recess, and we'll

20   reconvene in about five minutes.

21      (Recess at 9:47 a.m.)

22      (Reconvened at 10:03 a.m.)

23        THE COURT:  Please be seated.

24        This matter is before the Court for purposes of *de*

25   *novo* review of a determination on issues of detention.  A

1    magistrate judge initially made detention determinations on

2    January 26, and the Government requested reconsideration and *de*

3    *novo* review of the release determination made by the magistrate

4    judge.

5            Initially in a text order on February 2, 2012, the

6    Court reviewed what had been submitted by the Government and

7    the record prepared and presented before the magistrate judge

8    and concluded that there was no need to change the magistrate

9    judge's determination.

10           I've now considered the evidence that has been

11   presented at this hearing and the arguments of counsel.

12           I note that pursuant to 18 U.S.C. Section 3142(e)(1),

13   detention pending trial is appropriate if the Court finds no

14   condition or combination of conditions that will reasonably

15   assure the appearance of the person as required and the safety

16   of other persons and the community.

17           The several of the charges in this case give rise to a

18   statutory presumption that there are no conditions of release

19   that are satisfactory.  And thus the burden is entirely on the

20   defendant to establish that release is warranted.

21           18 U.S.C. Section 3143(e)(3)(A) sets out that

22   presumption with regard to a controlled substance offense, and

23   Section 3143(e)(3)(B) sets out that presumption with regard to

24   a charge of possession of a firearm in the furtherance of

25   drug-trafficking.

1        In considering whether to grant release, Section

2    3142(f) gives a list of nonexclusive factors.  These include

3    the nature and circumstances of the offenses charged, including

4    whether the charges involve firearms; the weight of evidence

5    against the person; the history and characteristics of the

6    person, including his character, family ties, employment

7    history, criminal history, etc.; and the nature and seriousness

8    of the danger to any person or the community that would be

9    posed by the person's release.

10        The magistrate -- the record before the magistrate

11    judge has been supplemented to some degree by the exhibits and

12    the argument made before me; but with regard to the issue of

13    flight, there has been no supplementation of the record.

14        I find with regard to that that we are limited to the

15    arguments and the evidence that was previously presented, and I

16    find that there has not been a substantial showing of a flight

17    risk that exceeds the presumption that is in effect by virtue

18    of the charges that have been brought against the defendant.

19    As a consequence, we are left with the presumption as to

20    flight.

21        The real issue here is safety of the community.  And

22    the argument of the Government is that there are two risk

23    concerns: an associational risk concern and a risk concern

24    derived from the weapons charges and the weapons that were

25    found at the clubhouse and at the defendant's residence.

1           With regard to the risks of association, I find that

2   the showing by the Government again does not exceed the

3   presumption that is in place by nature of the charges.  It's a

4   rather ephemeral risk.  It's based upon the association of

5   Mr. Johnson with a particular motorcycle club.  There is no

6   evidence before Court that despite his role as an officer in

7   that association and his title as an enforcer and his nickname

8   Supa that he has authority to or ever has directed or committed

9   any kind of illegal activity against any member of the club or

10  anyone else.  And therefore, the Court finds that that

11  particular risk based on the record before it is rather

12  ephemeral.

13          The concern with regard to the risk associated with

14  weapons is far more concrete.  There are weapons charges

15  against the defendant.  The charges include being in possession

16  of unregistered weapons.  And while the Court makes no

17  determination with regard to whether these charges are likely

18  to be proven at trial, there is some suggestion given the fact

19  that the weapons were not just at the clubhouse but also at the

20  defendant's residence that he was aware of the illegality of

21  his possession of weapons.

22          There is also a concern with regard to the weapons

23  that there is a missing weapon.  Whether it is a Glock pistol

24  or some other pistol that fit into a holster that was found at

25  the residence, there is, it appears, a missing weapon.

1          Looking at the factors that are set out in the

2     statute, the Court notes that the defendant has been convicted

3     of a felony; however, that conviction and the most serious of

4     the convictions are extremely dated, 1970's, 1980's, and his

5     recent charges are limited to charges associated with motor

6     vehicle violations.

7          Looking at his family ties, employment history, etc.,

8     the Court finds nothing that rebuts the presumption associated

9     with the risk derived from the weapons.

10         The argument made by the defense is that he has a

11    dated criminal record; that he was discharged early from

12    probation; that he's cooperated with the Government, and he has

13    strong ties to the community and will appear for hearings.

14         As I've indicated, risk of flight is not the primary

15    concern.  Safety of others is.  The burden is on the defendant

16    to show that the risk associated with the firearms and the

17    association can be addressed by conditions imposed on release.

18         I'm not convinced that that's the case, particularly

19    with regard to the weapons.  The missing weapon and the fact

20    that he was -- he has been charged and there is probable cause

21    to believe that he was in possession of an unlawful or

22    unregistered weapon suggests that any conditions of release

23    that are imposed could be voluntarily violated.  I see no

24    conditions that can address that risk.

25         And with regard to the presumption, I find that it has

1    not been rebutted.

2           Accordingly, the defendant will be -- will remain in

3    detention and there will be no conditions imposed allowing his

4    release.

5           Any need for clarification or further explanation?

6           *MR. TILL:*  Not from the Government, your Honor.

7           *MR. LEONARD:*  No.  Thank you, your Honor.

8           *THE COURT:*  Thank you.

9           Then that will conclude this hearing, and we'll stand

10   in recess.

11      (Recess at 10:12 a.m.)

12                        *   *   *   *   *

13                    **REPORTER'S CERTIFICATE**

14      I certify that the foregoing is a correct transcript from

15   the record of proceedings in the above-entitled matter.  Dated

16   at Denver, Colorado, this 19th day of August, 2013.

17

18                                    *S/Paul A. Zuckerman*
                                       Paul A. Zuckerman
19

20

21

22

23

24

25